AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Middle District of Alabama

| | |
|---|---|
| United States of America<br>v.<br>D'livro Lemat Beauchamp<br><br>*Defendant(s)* | Case No. 2:20mj174-SRW |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __July 22, 2020__ in the county of __Montgomery__ in the __Middle__ District of __Alabama__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21 United States Code, Section 841 (a) (1) | Unlawful Distribution of a Controlled Substance |

This criminal complaint is based on these facts:

Please see attached Affidavit

☑ Continued on the attached sheet.

*Complainant's signature*

Special Agent Darryl W. Henton, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 07/22/2020

/s/ Susan Russ Walker
*Judge's signature*

City and state: Montgomery, Alabama

Susan R. Walker, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT

I, Darryl W. Henton, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for the issuance of a criminal complaint to arrest Dr. D'livro Lemat Beauchamp for violations of 21 U.S.C. § 841(a)(1).

2. I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510, that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I have been a special agent of the Drug Enforcement Administration (DEA) since November of 1997. Prior to becoming a special agent, I was a state of Alabama, City of Mobile, Alabama police officer from November of 1985 to November of 1997. I also obtained a Bachelor of Science degree in criminal justice and a master's degree in public administration from Troy State University in Troy, Alabama. Pursuant to my employment with the DEA, I have investigated criminal violations of federal drug laws and related offenses, including, but not limited to, violations of Title 21, United States Code, Sections 841, 843, 846, 848, 856, 952, 960, and 963, and Title 18, United States Code, Sections 1952 and 1956. I am familiar with, and have employed, all normal methods of investigation, including, but not limited to, visual surveillance, electronic surveillance, informant interviews, interrogation, and undercover operations.

3. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841 have been committed by Dr. D'livro Lemat Beauchamp.

## PROBABLE CAUSE

### A. Background Information

5. I know, from the investigation described below, that Beauchamp is currently a physician licensed to practice medicine by the state of Alabama and practicing in Montgomery, Alabama. According to records maintained by the Alabama Board of Medical Examiners (ABME), Beauchamp obtained his Alabama Medical License on or about August 28, 1996. Since that time, to the best of my knowledge, he has practiced continuously in Alabama (with the exception of a brief respite from his practice during the COVID-19 pandemic).

6. Based on a review of publicly available databases maintained by the Alabama Secretary of State, I know that, on or about July 7, 2003, someone registered with the state of Alabama Obelisk Healthcare, L.L.C. Currently, Beauchamp is the sole member and registered agent of Obelisk Healthcare, L.L.C. The address provided for the business is 4705 Woodmere Blvd., Montgomery, AL 36106. The original "Nature of Business" reported to the Secretary of State was: "PROMOTE/DISTRIBUTE/RECORD/MFG/RETAIL/SELL CLOTHING/MUSICAL ITEMS." On or about April 20, 2011, according to the database, the purpose changed to "MEDICAL PRACTICES."

7. I know, from review of DEA records, that, on or about January 15, 1997, the DEA assigned to Beauchamp DEA registration BB5182124. This registration has been continuously renewed since that date. The last renewal occurred on or about June 28, 2017. At the time of the renewal, the address provided to be associated with the DEA registration number was 4705

2

Woodmere Boulevard, Montgomery, Alabama 36106. According to the DEA records, with this registration number, Beauchamp is authorized by the DEA to prescribe drugs in schedules 2, 2N, 3, 3N, 4, and 5.

8. I know, based on surveillance performed by an agent working with me, that Beauchamp currently practices at a building located at 4705 Woodmere Boulevard, Montgomery, Alabama 36106. The signage on the glass front door of the building lists the practice as "Obelisk Healthcare." I also know that, on the website for Obelisk Healthcare, L.L.C., obeliskhealthcare.com, Beauchamp is listed as the lead physician and the practice is listed as being located at 4705 Woodmere Boulevard. This website remains currently accessible as of July 17, 2020.

9. The website (obeliskhealthcare.com) describes Obelisk Healthcare as being "designed to meet all your primary health care needs by providing routine and minor emergency care for the entire family." The website goes on to state that prospective patients "simply come in any time [they] need medical care." Based on this statement, I infer that, at least at the time the website was published, Beauchamp's practice was a primary care practice.

10. The website (obeliskhealthcare.com) describes Beauchamp as "a Board-Certified Physician of Urgent Care Medicine." It further states that Beauchamp "began practicing medicine in Montgomery, Alabama in 1996" and that "[h]e plays an active role in providing state-of-the-art services for primary and urgent care to the entire Montgomery, Alabama area."

11. I am not aware of Beauchamp practicing medicine in any location other than 4705 Woodmere Boulevard in Montgomery. However, I know that he also operates some form of medical-spa practice located at the same address—4705 Woodmere Boulevard. That business is referred to as "Symmetry MedSpa" and maintains a website for that business.

3

symmetrymedspa.com. That website remains accessible as of July 17, 2020. According to the website for Symmetry MedSpa, the practice "provides everything from liposuction to laser hair removal, to treatments for cellulite and more." The website goes on to state that "Dr. D'livro Beauchamp, Medical Aesthetician, and his professional team provide expert services and treatments to give you a more youthful and rejuvenated appearance." I do not know how long Beauchamp has operated Symmetry MedSpa. Nothing on the website for Symmetry MedSpa indicates that, as part of his practice through that entity, Beauchamp provides long-term prescriptions for chronic pain conditions.

## B. February 10, 2020 Initial Receipt of Intelligence from Source of Information

12. In early 2020, I spoke with an investigator employed by the ABME. During that conversation, I asked the investigator whether the ABME had or was currently conducting an investigation of Beauchamp. The investigator informed me that in fact, he had recently received a call from a source of information who was in a unique position to provide intelligence about Beauchamp's medical practice. Based on his receiving of this information, the investigator had opened an investigation of Beauchamp.

13. Subsequently, on February 10, 2020, I spoke, over the telephone, with this person in a unique position to provide intelligence about Beauchamp's medical practice. I will refer to this person, throughout the remainder of this affidavit as "SOI-1."[1] During the telephone call, SOI-1 stated that she/he wished to provide information about Beauchamp and his practice, which she/he identified as being located at 4705 Woodmere Boulevard, Montgomery, Alabama 36106. She/He stated that Beauchamp practices at this location and that he is the only physician who does so. At his practice, according to SOI-1, Beauchamp prescribes Schedule II opioid

---

[1] After February 10, 2020, SOI-1 became a DEA informant. She/He has since been deactivated. To be clear, at the time SOI-1 provided initial information about Beauchamp, she/he was not a DEA informant.

controlled substances, including oxycodone. Beauchamp issues prescriptions by sending electronic prescriptions directly to pharmacies using a secure e-prescription platform. Additionally, SOI-1 stated that Beauchamp stores medical records associated with the care he provides his patients in three-different electronic health records platforms.

14. SOI-1 stated that she/he wished to inform law enforcement that Beauchamp was issuing controlled substances prescriptions to friends, fraternity brothers of his, and girlfriends of his fraternity brothers, even though most of these recipients of prescriptions were not coming to the office for examinations before receiving prescriptions. Additionally, Beauchamp was not maintaining medical records associated with the treatment—by "treatment," I mean prescriptions—he was providing to these persons. SOI-1 stated that some of these persons had no medical files at all in any of the databases associated with Beauchamp's practice. Others, said SOI-1, did have files, but those files did not indicate that the patient had been seen by Beauchamp in years. Moreover, SOI-1 stated that these persons' names did not appear on sign-in sheets because they did not come to the office before receiving controlled substances prescriptions. Instead, Beauchamp electronically sent to the pharmacies prescriptions for these persons without the persons ever coming to the practice.

15. SOI-1 provided the names of six individuals who received controlled substances prescriptions in this manner—in other words, without coming to the office and without, in the view of SOI-1, being a "patient" in the typical sense. SOI-1 also named S.M. as one of these patients. However, according to SOI-1, S.M. did occasionally come by the office. SOI-1 stated that S.M. lives in Atlanta.

16. SOI-1 stated that pharmacies sometimes called the office and sought to verify prescriptions issued to the above-named individuals and other persons who received controlled

5

substances prescriptions in this manner. According to SOI-1, when a pharmacy called seeking to verify a prescription issued to a "friend" of Beauchamp's (i.e., a fraternity brother, significant other fraternity brother, or some other person having an out-of-office relationship with Beauchamp), Beauchamp personally spoke with the representative of the pharmacy and authorized the prescription.

17. During the call, SOI-1 identified the following three companies as being used by Beauchamp and Obelisk Healthcare to maintain medical records electronically: (1) Spring Charts; (2) Practice Fusion; and (3) Patient Now.

C. **February 18, 2020 Interview with Source of Information**

18. On February 18, 2020, I, along with other agents working with me and two Assistant United States Attorneys met with SOI-1 at the United States Attorney's Office in Montgomery.

19. During the interview, SOI-1 repeated the allegations she/he previously made regarding Beauchamp.

20. She/He also further explained Beauchamp's use of medical records. She/He stated that physical, paper files are maintained at the office for all patients. She/He reported that information is transcribed, by a staff member, from the paper file into an electronic medical record platform. She/He went on to state that: (1) from an unknown date, the practice used the electronic health records platform, Spring Charts, to store electronic health records; (2) starting around January 2017, the practice switched from Spring Charts to Practice Fusion to store electronic health records and this platform was used by the practice from in or around January 2017 until in or around September 2019; and (3) in or around September 2019, the practice switched from Practice Fusion to Patient Now for its electronic records storage and this platform

6

is currently in use. According to SOI-1, each time the practice switched electronic health records platforms, the only information migrated from one platform to the other was patient identifying information. Information about medical office visits that occurred before the switching to a new platform was not moved from the old platform to the new platform. In other words, to determine whether there is a medical record to support a prescription issued by Beauchamp in 2016, one would have to look in the Spring Charts database—such information would not exist in Practice Fusion or Patient Now. Likewise, information about a prescription issued in 2018 could only be found in Practice Fusion.

21. SOI-1 went on to state that electronic prescribing is done through the electronic health records platform currently in use. Therefore, from in or about January of 2017 until in or about September of 2019, all electronic prescribing was done through Practice Fusion. However, since September of 2019, electronic prescribing for most patients has moved to Patient Now. Nevertheless, according to SOI-1, when issuing a prescription for a "friend"—one of the people described above who gets a prescription for a controlled substance without having to come to the office—Beauchamp continues to use the Practice Fusion system. Beauchamp does so, according to SOI-1, because he knows that the office staff is not accessing the Practice Fusion system on a routine basis anymore and therefore cannot monitor what he is doing. Additionally, SOI-1 made clear that an electronic prescription cannot be done—through any computer system—without Beauchamp himself entering a code into either his phone or a computer. Therefore, according to SOI-1, there is no way that the prescriptions described in this affidavit could be issued without Beauchamp's knowledge and consent.

22. SOI-1 also stated that, sometimes pharmacies or insurance companies would request to know the diagnoses associated with prescriptions Beauchamp was issuing to his

"friends." Whenever this would occur, Beauchamp would state that the diagnosis was "low back pain." I know from my training and experience that "low back pain" is a diagnosis commonly used by physicians to justify illegitimate prescriptions for pain medications like oxycodone. This is done because it can be difficult, even for a legitimate doctor, to diagnose a cause of low back pain.

23. SOI-1 added that, when "friends" of Beauchamp came to the practice, from time to time, staff members would question who the people were and why they were there. Beauchamp would respond, "If I tell you to let someone in, get them in."

24. SOI-1 further stated that, in the summer of 2018, Beauchamp stopped being a primary care and urgent care physician. He wanted to become a "med spa." As such, he began to focus on: breast implants, tummy tucks, esthetics, and liposuction. He also began to operate a gift shop in his practice where he sold scented candles and handbags and hired an esthetician who does, among other things, facials. Based on this information, it does not appear that Beauchamp should be prescribing monthly, long-term prescriptions for pain medications.

25. Finally, SOI-1 provided names of additional people who were, according to her, receiving from Beauchamp routine prescriptions for 90 30-milligram oxycodone tablets without having to be seen as patients and without having files. Such people included: T.C. and D.W.

**D.     Evaluation of Criminal Histories and PDMP Reports of February 18, 2020 Patients**

26. Thereafter, I and agents working with me obtained and evaluated criminal history and PDMP reports associated with the patients identified by SOI-1 during the February 18, 2020 interview, T.C. and D.W. The following summarizes findings as to T.C. and D.W.

   1.   **D.W.**

8

27.   D.W. has a date of birth of July 23, 1984. According to state records, he resides in Montgomery.

28.   The criminal history database did not indicate that D.W. had any prior criminal history.

29.   According to the five-year PDMP report, Beauchamp first wrote D.W. a prescription on March 26, 2018. That prescription was for 90 30-milligram oxycodone tablets. After that, Beauchamp wrote D.W. an identical prescription exactly once each month. The most recent identical prescription was issued on April 17, 2020. In total, Beauchamp has issued D.W. 26 such identical prescriptions. D.W. filled those prescriptions at seven different pharmacies.

30.   The PDMP report also indicated that D.W. received, in 2016, three short-term (two- or three-day) prescriptions for hydrocodone. These prescriptions were issued by physicians other than Beauchamp. And, in January of 2019, while he was receiving the prescriptions from Beauchamp, D.W. received a 1-day prescription for five oxycodone tablets from Dr. Brian N. Hassani, a Birmingham emergency medicine physician.

2.   **T.C.**

31.   T.C. has a date of birth of September 18, 1984. According to state records, she resides in Montgomery.

32.   The criminal history database did not indicate that T.C. had any prior criminal history.

33.   According to the PDMP report, on December 11, 2017, T.C. received her first prescription from Beauchamp—a prescription for 80 30-milligram oxycodone tablets. The next month, on January 9, 2018, she received another prescription from Beauchamp—a prescription for 90 30-milligram oxycodone tablets. Thereafter, T.C. received a prescription for 90 30-

milligram oxycodone tablets each month, with the most recent prescription having been issued on June 4, 2019—except that there was no prescription issued by Beauchamp in October of 2018. In total, T.C. received 18 prescriptions for oxycodone from Beauchamp—17 of which were 90-tablet prescriptions and 1 of which was an 80-tablet prescription. T.C. filled those prescriptions at three different pharmacies.

34. The PDMP report did not reflect that T.C. filled any other controlled substances prescriptions in Alabama in the last five years.

E. **Issuance of Search Warrants for and Acquisition of Electronic Evidence**

35. On February 21, 2020, a magistrate judge of this Court issued three search warrants authorizing the seizure of electronic evidence related to the above-described case. Each search warrant requested electronically stored patient files related to Beauchamp's treatment of individuals identified by SOI-1 as receiving illegitimate oxycodone prescriptions from Beauchamp. One search warrant was directed to Spring Charts (the electronic records provider from an unknown date until January of 2017, according to SOI-1). The second was directed to Practice Fusion (the electronic records provider from January of 2017 until in or around September of 2019, according to SOI-1). The third was directed to Patient Now (the electronic records provider from in or around September of 2019 to the present, according to SOI-1). I and agents working with me served each search warrant on or about February 24, 2020.

36. On or about February 25, 2020, I received correspondence from Spring Charts stating that Spring Charts was not in possession of any records responsive to the search warrant. According to the president of the company, Spring Charts did have a business relationship with Beauchamp and/or Obelisk Healthcare, L.L.C. However, that business relationship did not allow Beauchamp or the business to store medical records on any cloud-based server accessible by

Spring Charts. Rather, according to company records, all records storage was done on some other server, perhaps a server maintained at Beauchamp's office.

37. On or about March 6, 2020, I received from Practice Fusion, copies of electronic records in the business's possession that were responsive to the search warrant. These records, according to Practice Fusion, were associated with Beauchamp and were maintained on a Practice Fusion cloud-based server.

38. On or about June 17, 2020, I received records from Patient Now. These records, according to Patient Now, were associated with Beauchamp and were maintained on a Patient Now cloud-based server.

### F. Expert Evaluation of PDMP Reports

39. During the past weeks, I consulted an independent medical expert licensed to practice medicine in the state of Georgia, Dr. Gene Kennedy. Dr. Kennedy has been qualified to testify in federal court on numerous occasions regarding the appropriateness of controlled substances prescriptions. He currently practices pain management, but previously maintained a general practice.

40. Initially, I sent to Dr. Kennedy: (1) the PDMP reports associated with patients named by SOI-1; and (2) a report summarizing all of the controlled prescriptions Beauchamp issued in the last year.

41. On or about March 10, 2020, I received a letter from Dr. Kennedy summarizing his findings regarding the PDMP materials. The report is reproduced as follows:

March 10, 2020

S.A. Darryl Henton
Drug Enforcement Administration
Birmingham, Alabama

11

Dear Mr. Henton:  RE: Case GL-20-0011

I have reviewed the PDMP documentation pertaining to Dr. Beauchamp.

In my opinion, the reports contain some findings that may be indicative of the non-legitimate prescribing of scheduled medications.

In support of this assertion, I would note that of the individual patient PDMPs reviewed:

- All patients received oxycodone 30 mg on their <u>initial</u> encounter, as far as the provided PDMP shows. (Attachments A through R)
- All patients ultimately received oxycodone 30 mg, <u>#90 per month</u>.
- 8 patients had received very <u>short courses</u> of lower dosage scheduled medications from other providers prior to presentation. (Attachments A through E, G, H)
- 10 patients had <u>NO previous oxycodone prescriptions</u> present on their PDMP reports prior to presentation. (Attachments I through R)
- 4 patients had prescriptions filled at an alarming number of pharmacies. (Attachments G, L, N, O)

The one year PDMP was extensive. The document was 117 pages long. With this in mind, I reviewed <u>only up to the letter G</u>, and have attached some examples of remarkable findings.

I would note:

- 2 patients with the surname of [A] frequently received scheduled medications within a day of each other, and occasionally on the same day. These medications included alprazolam, clonazepam and Suboxone. (Attachment S)
- Patient [B] consistently received <u>simultaneous</u> prescriptions for <u>dextroamphetamine and phentermine</u>. (Attachment T)
- Patient [C] consistently received prescriptions for dextroamphetamine and alprazolam. (Attachment U)
- 3 patients who appear to be in the same family all received prescriptions for oxycodone 30 mg #90. At least 2 of these patients repeatedly received their prescriptions on the same day, and on one occasion, all 3 received prescriptions on the same day (Attachment V)
- 1 patient, [W.G.], consistently received <u>simultaneous</u> prescriptions for <u>buprenorphine, Soma, Diazepam, Dronabinol and methylphenidate</u>. (Attachment W)

<u>This is alarming.</u>

12

It would be necessary to review individual patient charts to have a definitive, fully informed opinion as to whether these prescriptions were provided for a legitimate medical purpose and within the course of acceptable medical practice.

However, based solely on the PDMP reports provided the prescribing pattern is not reflective of what would be expected to be prescribed in an ordinary practice.

Please do not hesitate to contact me if you have any questions regarding my review of the PDMP reports.

Sincerely,

/s/Gene S. Kennedy

Gene S. Kennedy, M.D.

### G.     Expert Evaluation of Medical Files

42.     During the spring and summer of 2020, I sent to the medical expert, Dr. Kennedy, copies of patient records maintained by Beauchamp and obtained by way of the search warrants served on the electronic medical records providers. I asked him to review the records found in the Patient Now and Practice Fusion databases pertaining to three patients. Dr. Kennedy selected the records of, among others, T.C. and D.W. to review. He reviewed those records to assess whether the oxycodone prescriptions written to those patients by Beauchamp were issued for legitimate medical purposes and within the normal course of professional medical practice.

43.     On or about July 1, 2020, I received a cover letter and reports from Dr. Kennedy. Each report pertained to one of the patient files. Dr. Kennedy's findings are as set forth below.

44.     As for the cover letter, it was dated June 28, 2020. It stated, in part, "In reviewing the charts and PDMP documentation, I concluded that the scheduled prescriptions provided by Dr. Beauchamp were issued outside the scope of usual medical practice for each of the 3 charts. I also concluded that the scheduled prescriptions (oxycodone) were not provided for a legitimate medical purpose in each of the charts." In the conclusion section of the letter, Dr. Kennedy

summarized his findings, stating: "The prescribing demonstrated in the 3 medical charts reviewed was perilous to the patients and to the community at large, outside the scope of usual medical practice and not for a legitimate medical purpose."

45. In his report on the T.C. electronic files, Dr. Kennedy wrote, among other things: (1) "There was no diagnostic assessment of this patient"; (2) although the patient presented with a complaint of neck pain at her initial encounter, Beauchamp "did not do a neck examination"; (3) Beauchamp never documented a treatment rationale in the chart; (4) Beauchamp never attempted to obtain past medical records; and (5) Beauchamp "provided an extraordinarily large number of oxycodone prescriptions that are unaccounted for." At the conclusion of the report, Dr. Kennedy stated, "As noted, this patient was provided with ongoing prescriptions for 30 mg oxycodone pills without encounter notes, credible examinations or any support whatsoever. In the absence of further, unreviewed physician documentation, in my view it would be impossible to support the prescriptions provided."

46. In his report on the D.W. electronic files, Dr. Kennedy wrote, among other things: (1) the physical examinations documented were not credible; (2) Beauchamp did not attempt to obtain past medical records; (3) Beauchamp did not request diagnostic studies to determine the cause of the "low back pain" reported by the patient; (4) Beauchamp "initiated oxycodone at 90 mg per day (135 MME) in an opioid naïve patient without a credible treatment rationale or treatment plan," which Dr. Kennedy stated "was perilous"; and (5) Beauchamp "provided a large number of oxycodone prescriptions that [were] not discussed in messages or in encounter notes." Dr. Kennedy concluded this report by stating that the prescriptions provided to D.W. by Beauchamp "were outside the course of usual medical practice and were not prescribed for a legitimate medical purpose." He noted that these prescriptions "represented a significant danger

both to the patient and to the public at large," noting that "[a] fatal outcome would not have been surprising."

### H. Search of Beauchamp's Office

47. On July 22, 2020, I and other agents executed a warrant issued by this Court to search Beauchamp's medical practice. During that search, I attempted to locate patient files associated with the treatment of T.C. and D.W.

48. In an attempt to locate such files, I asked Beauchamp where such files would be. He directed me to a room and said that if the files were not in that room, they did not exist.

49. I and other agents, with the assistance of Beauchamp's employees, attempted to find physical files in that room associated with T.C. and D.W. After an exhaustive search, we were unable to locate such files. Accordingly, it is probable that such files do not exist.

50. Accordingly, there are no records at Beauchamp's office that should cause Dr. Kennedy to alter his conclusions about the legitimacy of the prescriptions to D.W. and T.C.

## CONCLUSION

51. Based on the forgoing, I request that the Court issue a two-count complaint. The first count should charge that Beauchamp knowingly and intentionally distributed and dispensed and caused to be distributed and dispensed to D.W., from on or about March 26, 2018 to on or about April 17, 2020, oxycodone, a Schedule II controlled substance, for no legitimate medical purpose and outside the normal course of professional medical practice, in violation of 21 U.S.C. § 841(a)(1). The second count should charge that Beauchamp knowingly and intentionally distributed and dispensed and caused to be distributed and dispensed to T.C., from on or about December 11, 2017 to on or about June 4, 2019, oxycodone, a Schedule II controlled substance,

for no legitimate medical purpose and outside the normal course of professional medical practice, in violation of 21 U.S.C. § 841(a)(1).

Respectfully submitted,

Subscribed electronically and sworn
to telephonically on July 22, 2020.
Darryl W. Henton
Special Agent
Drug Enforcement Agency

Sworn to before me this  22nd day of July, 2020.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE
MIDDLE DISTRICT OF ALABAMA

16